**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

MATTHEW JACKSON,

                  Plaintiff,

    vs.

UNICITY INTERNATIONAL, *et al.*,

             Defendants.

Case No.: 2:25-cv-00738-GMN-NJK

**ORDER ON MOTION TO COMPEL ARBITRATION AND MOTION TO DISMISS**

Pending before the Court is Defendant Anytime Labor L.L.C.'s Motion to Compel Arbitration, (ECF No. 28).  Plaintiff Matthew Jackson filed a Response, (ECF No. 34), to which Anytime Labor filed a Reply, (ECF No. 39).  Defendant Unicity International also filed a Reply to Plaintiff's Response, (ECF No. 38).  Also pending before the Court is Anytime Labor's Motion to Stay Case, (ECF No. 30), to which Plaintiff filed a Response, (ECF No. 32), and Anytime Labor filed a Reply, (ECF No. 39).[1]  Further pending before the Court is Defendant Unicity's Motion to Dismiss, (ECF No. 35).  Plaintiff filed a Response, (ECF No. 42), to which Unicity filed a Reply, (ECF No. 48).  For the reasons explained below, the Court GRANTS Anytime Labor's Motion to Compel Arbitration.  The Court also GRANTS, in part, and DENIES, in part, Unicity's Motion to Dismiss.

## I.    <u>BACKGROUND</u>

Anytime Labor is a staffing agency that provides temporary workers to employers. (First Am. Compl. ("FAC") ¶ 10, ECF No. 24).  Plaintiff worked as a warehouse hand for Defendant Unicity through Anytime Labor. (*Id.* ¶ 9).  Unicity is a company that sells nutritional products

---

[1] Given Magistrate Judge Koppe's previous granting of the Motion to Stay Discovery, (*see* Order, ECF No. 41), and this Court's granting of Anytime Labor's Motion to Compel Arbitration, the Court DENIES Anytime Labor's Motion to Stay Case as moot.

to consumers and operates a warehouse in Las Vegas that manufactures and ships Unicity's products. (*Id.* ¶ 10).  As a warehouse hand for Unicity, Plaintiff packaged its products that were shipped to consumers. (*Id.*).  While Plaintiff was working for Unicity, Anytime Labor controlled his employment placement, the amount of money he was paid, and other terms and conditions of his employment, while Unicity controlled the day-to-day activities of his work including the location, hours, and type of work he was doing. (*Id.*).

Plaintiff is African American and alleges that he was repeatedly subjected to racial discrimination on a nearly daily basis while he was working at Unicity. (*Id.* ¶ 12).  This included being called racial slurs by his coworkers and his supervisors, Martin and Julio. (*Id.*).  Plaintiff explains that he complained to his supervisor, Sergio, about the discrimination and harassment he was facing in the workplace, and nothing was done to address the situation. (*Id.* ¶ 13).  After he complained, Plaintiff alleges that his job duties were re-assigned, and he was asked to only assist with menial tasks such as box assembly, and the discriminatory conduct continued during this time. (*Id.* ¶ 14).  As time went on, Plaintiff alleges that the harassment escalated and his coworkers and supervisors would threaten, intimidate, and attempt to fight him. (*Id.* ¶ 16).

Approximately one week before Plaintiff would have been eligible for permanent placement at Unicity, he alleges that he was terminated on the basis of his race. (*Id.* ¶ 17).  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Nevada Equal Rights Commission ("NERC"). (*Id.* ¶ 20).  Shortly after, the EEOC closed Plaintiff's case and issued him a right to sue notice. (*Id.*).  Plaintiff then filed this lawsuit bringing claims for negligent supervision and retention, intentional infliction of emotional distress ("IIED"), and state and federal employment discrimination, harassment, and retaliation. (*Id.* ¶¶ 27–117).  Anytime Labor now moves to compel Plaintiff to arbitrate his

claims, (ECF No. 28), and Unicity moves to dismiss Plaintiff's claims against it for failure to state a claim, (ECF No. 35).

## II.   LEGAL STANDARD

### A. Arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., governs the enforcement of written arbitration agreements, including agreements arising from most employment contracts. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111, 119 (2001).  Section 2 of the FAA provides that:

> A written provision in. . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction. . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  "In enacting § 2 of the [FAA], Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984).  Courts place arbitration agreements "upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).

Under the FAA, parties to an arbitration agreement may seek an order from the Court to compel arbitration. 9 U.S.C. § 4.  The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (alteration in original).  Thus, the Court's "role under the [FAA] is. . . limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Lee v. Intelius Inc.*, 737 F.3d 1254, 1261 (9th Cir. 2013).  In answering these questions, the Court must "interpret

the contract by applying general state-law principles of contract interpretation, while giving due regard to the federal policy in favor of arbitration by resolving ambiguities as to the scope of arbitration in favor of arbitration. *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049 (9th Cir. 1996).  The party seeking to compel arbitration "bears the burden of proving the existence of a valid arbitration agreement by [a] preponderance of the evidence." *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1005 (9th Cir. 2010) (internal quotation marks and citation omitted).  If a district court decides that an arbitration agreement is valid and enforceable, then it should either stay or dismiss the claims subject to arbitration. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1276–77 (9th Cir. 2006).

### B. Motion to Dismiss

Dismissal is appropriate under Rule 12(b)(6) where a pleader fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  A pleading must give fair notice of a legally cognizable claim and the grounds on which it rests, and although a court must take all factual allegations as true, legal conclusions couched as factual allegations are insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Accordingly, Rule 12(b)(6) requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

These same standards apply to claims against municipal governments under § 1983. *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012).  A plaintiff's allegations "may not simply recite the elements" of a claim under *Monell*. *See id.* (quoting *Starr*

*v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).  The complaint must "contain sufficient allegations of underlying facts to give fair notice" of plaintiff's claims and allow the municipal government "to defend itself effectively." *Id.* (quoting *Starr*, 652 F.3d at 1216).  The plaintiff's allegations "must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quoting *Starr*, 652 F.3d at 1216).

If the court grants a motion to dismiss for failure to state a claim, the court should grant leave to amend "unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)).  Pursuant to Rule 15(a), the court should "freely" give leave to amend "when justice so requires," and in the absence of a reason such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## III.   DISCUSSION

The Court first addresses Anytime Labor's Motion to Compel Arbitration before turning to Unicity's Motion to Dismiss.

### A. Anytime Labor's Motion to Compel Arbitration

Anytime Labor argues that Plaintiff must be compelled to arbitrate his claims because he unambiguously agreed to arbitrate any dispute against Anytime Labor that arises out of his employment. (Mot. Compel. Arb. 4:27–5:7, ECF No. 28).  Plaintiff argues that he should not be compelled to arbitrate his claims against Anytime Labor because (1) he was a transportation worker exempt from the FAA, and (2) the arbitration agreement is unenforceable. (*See generally* Resp., ECF No. 34).  Because the parties disagree on whether the Nevada Uniform

Arbitration Act ("UAA") or the FAA applies to their agreement, the Court beings by addressing that threshold issue.

### 1. Application of the FAA

Anytime Labor argues that the choice of law clause in the parties' arbitration agreement requires the Court to apply the Nevada UAA, rather than the FAA. (Reply 3:24–4:3, ECF No. 39).  While the FAA "does not itself create independent federal jurisdiction, [it] 'creates a body of federal substantive law establishing and regulating' arbitration agreements that come within the FAA's purview." *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1105 (9th Cir. 2003) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32 (1983)). "When an agreement falls within the purview of the FAA, there is a 'strong default presumption . . . that the FAA, not state law, supplies the rules for arbitration.'" *Johnson v. Gruma Corp.*, 614 F.3d 1062, 1066 (9th Cir. 2010) (quoting *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1269 (9th Cir. 2002), *opinion amended on denial of rh'g*, 289 F.3d 615 (9th Cir. 2002)).  "To overcome that presumption, parties to an arbitration agreement must evidence a 'clear intent' to incorporate state law rules for arbitration." *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1311 (9th Cir. 2004) (quoting *Sovak*, 280 F.3d at 1269).

So, the Court must first determine whether the agreement falls within the purview of the FAA.  The parties dispute whether the agreement is one "evidencing a transaction involving commerce," such that the FAA would apply. 9 U.S.C § 2; *U.S. Home Corp. v. Michael Ballesteros Trust*, 415 P.3d 32, 38 (Nev. 2018).  The FAA defines "commerce" to mean "among the several States or with foreign nations." 9 U.S.C. § 1.  The Supreme Court has "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of are that ordinarily signal the broadest possible permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003) (quoting *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S.

265, 273–74 (1995)). Thus, "the FAA encompasses a wider range of transactions than those actually 'in commerce'—that is, 'within the flow of interstate commerce.'" *Id.* (quoting *Allied-Bruce*, 513 U.S. at 273). Even contracts evidencing intrastate economic activities are governed by the FAA if the activities, when viewed in the aggregate, "substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 556 (1995); *see Alafabco, Inc.*, 539 U.S. at 56-57 ("Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice ... subject to federal control.'") (quoting *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948)).

Anytime Labor argues that the agreement at issues here does not involve interstate commerce because it was between Anytime Labor and Plaintiff, who are both residents of Nevada. (Anytime Labor's Suppl. Br. 4:17–18, ECF No. 60). Thus, according to Anytime Labor, any resulting employment that may implicate interstate commerce is irrelevant. (*Id.* 4:19). But taking such a narrow view of the contract is at odds with the precedent on this question. As explained above, even a contract involving intrastate commerce is governed by the FAA if the activities substantially affect interstate commerce. *Lopez*, 514 U.S. at 556. Thus, the Court must look beyond just the residence of both parties to the contract.

For example, in *Maide, LLC v. DiLeo for DiLeo*, the Nevada Supreme Court considered whether the FAA applied to a contract between a nursing home and one of its residents. 504 P.3d 1126 (2022). The *Maide* court reached the conclusion that the FAA applied to the nursing home contract because the agreement promised to provide the resident with food, goods, and services that would inevitably involve shipping items across state lines. *Id.* at 1130–31. Though both parties to the contract were in Nevada, the court in *Maide* looked beyond that to determine whether the contract involved interstate commerce.

Here, the contract between the parties was entered into for the purpose of placing Plaintiff as a temporary employee at a third-party employer.  This contract led to Plaintiff's placement at Unicity, where he performed work that unquestionably involved interstate commerce: preparing packages for shipping to consumers throughout the United States. (Pl.'s Suppl. Br. 6:20–28, ECF No. 57).  Thus, interstate commerce was actually involved in the transaction between the parties.  Because the FAA applies so long as there is evidence that interstate commerce was actually involved in the transaction, *see Allied-Bruce*, 513 U.S. at 281, this is a contract to which the FAA would apply.  Moreover, Anytime Labor is a staffing company that operates more than 30 offices in several states including Nevada.  Its business model involves entering into employment contracts with people who will be placed in temporary job positions.  That economic activity, viewed in the aggregate, is one that would have a "substantial effect on interstate commerce." *Alafabco*, 539 U.S. at 56–57.  As a result, the Court concludes that the FAA applies to the parties' agreement.

### 2.  FAA Transportation Worker Exemption

Having found that the FAA applies, the Court next considers Plaintiff's argument that § 1 of the FAA exempts him as a transportation worker.  Section 1 of the FAA, known as the "transportation worker exemption," exempts from the FAA's coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.  As the party opposing arbitration, Plaintiff bears the burden of establishing that the exemption applies. *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1194 (9th Cir. 2024).

The Court employs a two-step analysis to determine whether the transportation worker exemption applies.  At step one, the Court "defin[es] the relevant 'class of workers' to which" Plaintiffs belong. *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022).  At step two, the Court "determine[s] whether that class of workers is 'engaged in foreign or interstate

commerce.'" *Id.*  A class of workers is engaged in foreign or interstate commerce if the workers play a "direct and necessary role in the free flow of goods across borders." *Id.* at 458.  In other words, the workers must be "actively 'engaged in transportation' of those goods across borders via the channels of foreign or interstate commerce." *Id.*; *see also Ortiz v. Randstad Inhouse Servs., LLC*, 95 F.4th 1152, 1159-60 (9th Cir. 2024) ("[A]n employee's relationship to the movement of goods must be sufficiently close enough to conclude that his work plays a tangible and meaningful role in their progress through the channels of interstate commerce."). Courts must give the transportation worker exemption a "narrow construction." *Circuit City Stores, Inc.*, 532 U.S. at 118.

At the first step, the Court focuses on "the actual work that the members of the class, as a whole, typically carry out," not on what the employer "does generally." *Saxon*, 596 U.S. at 456.  Plaintiff worked in a warehouse operated by Unicity in Henderson, Nevada. (Jackson Decl. ¶ 3, Ex. 1 to Resp., ECF No. 34-1).  He assisted with unloading boxes of Unicity products and placing items onto shelves in the warehouse to prepare consumer orders. (*Id.* ¶ 4).  Once an order was placed by a consumer, the products in the warehouse would be placed into a package to fulfill the order, the package would be closed and secured, and the package would be placed on a pallet with other consumer orders. (*Id.*).  FedEx, USPS, and other transportation companies would then collect the pallets containing the Unicity products from the warehouse and transport the Unicity products directly to consumers. (*Id.*).  Plaintiff declares that his primary job duties included: "(1) creating and preparing boxes for shipments of Unicity's products to customers; (2) placing products into boxes for shipment; (3) loading and unloading boxes and transporting packages to warehouse racks; (4) organizing packages containing consumer products to be placed onto trucks that would transport the products to consumers; (5) transporting packages from one area of the warehouse to another area of the warehouse using a forklift; (6) organizing and placing packages onto pallets that would be shipped directly to

consumers from the warehouse; and (7) assisting other warehouse workers to prepare packages to leave the warehouse for their final destination." (*Id.* ¶ 5).

Anytime Labor does not dispute any of these job duties. Instead, it argues that Plaintiff improperly conflates his job duties at Unicity with those at Anytime Labor. Because Plaintiff does not provide a job description that identifies the duties assigned to him at Anytime Labor, it argues that he cannot be found to fit into the transportation exception. (Reply 4:17–5:11). But this argument fails under *Ortiz*, 95 F.4th at 1161. Similar to Plaintiff here, the plaintiff in *Ortiz* was hired by a staffing agency, Randstad, that placed him at another company, GXO. *Id.* at 1157. When considering Randstad's motion to compel arbitration, the *Ortiz* court affirmed the district court's consideration of the plaintiff's job duties for GXO. *Id.* Thus, the Court will also look to Plaintiff's job duties at Unicity. Because Anytime Labor does not dispute any of the job duties Plaintiff describes in his declaration, the Court defines the relevant class of workers as those who engaged in the undisputed activities that Plaintiff performed at Unicity.

At the second step, the Court considers whether that class of workers engaged in foreign or interstate commerce. *Saxon*, 596 U.S. at 458. Plaintiff points to *Ortiz*, where the Ninth Circuit found that a warehouse worker who transported Adidas packages fell within Section 1's exemption. 95 F.4th at 1161–62. Again, the facts in *Ortiz* are very similar to those here: they involved "exclusively warehouse work" that included "transporting packages to and from storage racks, helping other employees in obtaining packages so they could be shipped, and assisting the Outflow Department to prepare packages for their subsequent shipment." *Id.* at 1161. Notably, the Court assumed that the plaintiff was not involved in unloading shipping containers upon their arrival or loading them into trucks when they left the warehouse, tasks that would be more directly linked to interstate shipment of goods. *Id.* The *Ortiz* court concluded that the plaintiff was an exempt transportation worker, explaining that he "fulfilled an admittedly small but nevertheless 'direct and necessary' role in the interstate commerce of

goods," because he "ensured that good would reach their final destination by processing and storing them while they awaited further interstate transport." *Id.* at 1162. Ortiz was also "actively engaged" and "intimately involved with" transportation, the court explained, because he handled goods "as they went through the process of entering, temporarily occupying, and subsequently leaving the warehouse—a necessary step in their ongoing interstate journey to their final destination." *Id.*

Here, Plaintiff's job duties are strikingly similar to those the court considered in *Ortiz*, and Anytime Labor makes no attempt to distinguish them. His duties involved only warehouse work and similarly included transporting packages within the warehouse, organizing them, and helping prepare them for shipping across state lines. (Jackson Decl. ¶ 5, Ex. 1 to Resp.). Just like the plaintiff in *Ortiz*, he therefore played a "direct and necessary" role in the interstate commerce of goods," and was "actively engaged" and "intimately involved with" transportation through his handling of goods during a "necessary step in their ongoing interstate journey to their final destination." *See Ortiz*, 95 F.4th at 1162. Because the Court finds that Plaintiff was actively engaged in the interstate commerce of goods, it concludes that he is an exempt transportation worker under Section 1 of the FAA.

But that conclusion does not end the Court's inquiry. Even though the Court concludes that the FAA provides no basis to enforce the arbitration agreement, "it does not follow [] that the arbitration clause is unenforceable." *Chappel v. Lab'y Corp. of Am.*, 232 F.3d 719, 725 (9th Cir. 2000). Instead, "[w]hile the distinctive procedural apparatus and presumption of arbitrability of the FAA would fall away" under these circumstances, Plaintiff may "still be required under the law of contract to arbitrate in accordance with the claims." *Id.*; *see also Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 596 (3d Cir. 2004) ("In our view, the effect of Section 1 is merely to leave the arbitrability of disputes in the excluded categories as if the

[Federal] Arbitration Act had never been enacted.") (quoting *Mason–Dixon Lines, Inc. v. Local Union No. 560*, 443 F.2d 809 (3d Cir. 1971)).

Here, the parties' arbitration agreement provides: "This Agreement shall be governed by the laws of the State in which the employee was hired, without regard to that state's conflict-of-laws rules."[2] (Agreement at 2, Ex. A-2 to Mot. Compel, ECF No. 28-1).  Because the FAA doesn't apply, this clause evidences the intent of the parties to apply state arbitration law. Nevada law does not contain an equivalent to the FAA's exemption for transportation workers. Nev. Rev. Stat. ("NRS") 38.219.  Thus, the arbitration agreement here must be enforced under state law.

Though Plaintiff argues that the FAA preempts the UAA, "[t]here is no language in the FAA that explicitly preempts the enforcement of state arbitration statutes." *Palcko*, 372 F.3d at 595.  As the Nevada Supreme Court explained in *U.S. Home Corporation*, "the Supreme Court has made unmistakably clear that, when the FAA applies, it preempts state laws that *single out and disfavor* arbitration." 415 P.3d at 40 (emphasis added).  Here, the Nevada UAA does not disfavor arbitration; on the contrary, it furthers the general policy goals of the FAA.

Informing the Court's conclusion is the Third Circuit's consideration of this same question in *Palcko*, 372 F.3d at 595–96.  There, the court considered the question of whether the FAA's transportation exemption preempted state arbitration law that did not include such an

---

[2] Because "a general choice-of-law clause within an arbitration provision does not trump the presumption that the FAA supplies the rules for arbitration," *Sovak*, 280 F.3d at 1270, Anytime Labor is not correct that this choice of law provision decides the question of whether the FAA or UAA applies prior to determining whether the Section 1 exemption applied.  Courts must determine whether an arbitration agreement evidences "a 'clear intent' to incorporate state law rules for arbitration." *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 386 F.3d 1306, 1311 (9th Cir. 2004) (quoting *Sovak*, 280 F.3d at 1269).  Nothing in this provision indicates that the parties intended to have the state law rules for arbitration govern, specifically.  Thus, prior to finding that Plaintiff is exempt from the FAA, the Court was required to interpret the clause "as simply supplying state substantive, decisional law, and not state law rules for arbitration." *See Sovak*, 280 F.3d at 1270.  Having now found that the FAA does not apply, the Court considers whether this choice of law provision provides for the enforcement of the arbitration agreement under Nevada law instead.

exception. *Id.*  Relying on the Supreme Court's opinion in *Volt Information Sciences, Inc*, 489 U.S. 468, which emphasized that the FAA does not reflect a congressional intent to occupy the entire field of arbitration, the *Palcko* court concluded the state arbitration law was not preempted because enforcement under state law did not contradict any language of the FAA, but instead furthered the general policy goals of the FAA favoring arbitration. *Id.*; *see also Blackman v. Aaron's Co. Inc.*, No. 2:23-CV-01248-APG-MDC, 2024 WL 1053152, at *2 (D. Nev. Feb. 14, 2024) (finding an arbitration clause enforceable under Nevada law, even if Plaintiff were exempt as a transportation worker under the FAA).  Accordingly, the Court finds that Nevada law applies and requires enforce the parties' arbitration agreement.

### 3.  Validity of the agreement

But even if the UAA requires enforcement of the arbitration agreement, the Court must first consider whether there is a valid agreement to arbitrate.  Plaintiff argues that the agreement is unenforceable because it is both substantively and procedurally unconscionable, and because it violates NRS 597.997.  The Court considers each argument in turn.

### i. Unconscionability

Plaintiff also argues that the arbitration agreement is unenforceable under Nevada law because it is unconscionable. (Resp. 11:21–14:12).  In evaluating Plaintiffs' unconscionability argument, applicable state law governs. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  Nevada has a strong public policy in favor of arbitration, and arbitration clauses are generally enforceable. *Gonski v. Second Jud. Dist. Ct. of State ex rel. Washoe*, 245 P.3d 1164, 1168 (Nev. 2010), *overruled on other grounds by U.S. Home Corp.*, 415 P.3d at 42. "Nevertheless, courts may invalidate unconscionable arbitration provisions." *D.R. Horton, Inc. v. Green*, 96 P.3d 1159, 1162 (Nev. 2004), *overruled on other grounds by U.S. Home Corp.*, 415 P.3d at 42; *see also Burch v. Second Jud. Dist. Ct. of State ex rel. Cnty. of Washoe*, 49 P.3d 647, 650 (Nev. 2002).  "A contract is unconscionable only when the clauses of that contract and

the circumstances existing at the time of the execution of the contract are so one-sided as to oppress or unfairly surprise an innocent party.*" Bill Stremmel Motors, Inc., v. IDS Leasing Corp.*, 514 P.2d 654, 657 (Nev. 1973). "Nevada law requires both procedural and substantive unconscionability to invalidate a contract as unconscionable." *U.S. Home Corp.*, 415 P.3d at 40 (citing *Burch*, 49 P.3d at 650). Thus, the Court first addresses the issue of procedural unconscionability.

Plaintiff contends that the arbitration agreement is procedurally unconscionable because it is an adhesion contract, and because it failed to inform Plaintiff that he was waiving substantive rights. (Resp. 12:14–27). Under Nevada law, "[a] contract clause 'is procedurally unconscionable when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract." *Tough Turtle Turf, LLC v. Scott*, 537 P.3d 883, 885 (Nev. 2023) (quoting *D.R. Horton, Inc.*, 96 P.3d at 1162). As to Plaintiff's adhesion contract argument, the Nevada Supreme Court has declined to apply the unconscionable adhesion contract doctrine to employment contract cases. *See D.R. Horton*, 96 P.3d at 1162; *Kindred v. Second Jud. Dist. Ct. ex rel. Cnty. of Washoe*, 996 P.2d 903, 907 (Nev. 2000) ("We have never applied the adhesion contract doctrine to employment cases."). The Court therefore rejects Plaintiff's contract of adhesion argument.

Regarding Plaintiff's argument that the agreement failed to inform him that he was waiving substantive rights, Plaintiff fails to identify with specificity what about the arbitration agreement is deficient in the single, conclusory sentence in which he makes this argument. Plaintiff has therefore not met his burden to show that the agreement is procedurally unconscionable. *Gonski*, 245 P.3d at 1169 ("[A]ny party opposing arbitration must establish a defense to enforcement."). And because Nevada law requires both procedural and substantive

unconscionability, the Court need not examine substantive unconscionability before reaching the conclusion that the agreement was not unconscionable. *U.S. Home Corp.*, 415 P.3d at 40.

### ii. Compliance with NRS 597.997

Plaintiff also argues that the arbitration does not comply with NRS 597.995, which "requires any agreement that includes an arbitration provision to also include a specific authorization for that provision." *Maide, LLC*, 504 P.3d at 1127.  Though the Nevada Supreme Court has held that the FAA preempts NRS 597.995, *id.*, the parties dispute whether it does so when, as here, a plaintiff falls into the FAA's transportation worker exemption.  But the Court need not reach that issue because, even if NRS 597.995 is not preempted here, Plaintiff has failed to provide any meaningful argument or substantive analysis for why this agreement does not comply with its requirements.  Without more, the Court cannot find that Plaintiff has met his burden of showing that the agreement is not enforceable.  Accordingly, the Court finds that the agreement is enforceable under Nevada law and must be enforced.  Thus, Anytime Labor's Motion to Compel Arbitration is GRANTED.

### 4.  Compelling Unicity to Arbitrate

Should the Court compel him to arbitrate his claims against Anytime Labor, Plaintiff then argues that Defendant Unicity should also be compelled to arbitrate.  Unicity filed a limited Reply to Plaintiff's Response to the Motion to Compel Arbitration, arguing that it should not be compelled. (Unicity Arb. Reply, ECF No. 38).

"[N]onsignatories of arbitration agreements may be bound by the agreement under ordinary contract and agency principles." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Letizia v. Prudential Bache Sec., Inc.*, 802 F.2d 1185, 1187–88 (9th Cir. 1986)); *RUAG Ammotec GmbH v. Archon Firearms, Inc.*, 538 P.3d 428, 432 (2023).  Courts have bound nonsignatories to arbitration clauses where the nonsignatory "knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement" *Comer*,

436 F.3d at 1101 (quoting *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates*, 269 F.3d 187, 199 (3d Cir. 2001)).

Plaintiff argues that Unicity should be compelled to arbitrate because it "received a direct benefit from the employment application and contractual arrangement between Plaintiff and Anytime Labor." (Resp 14:14–15:8).  But Plaintiff does not explain how Unicity "knowingly exploit[ed] the agreement containing the arbitration clause despite having never signed the agreement." *Comer*, 436 F.3d at 1102.  Even assuming Unicity received a benefit from this contract, which Plaintiff fails to explain outside of a conclusory claim that it did, there are no allegations that Unicity has sought to enforce the terms of the agreement between Plaintiff and Anytime Labor, nor otherwise take advantage of them. *See id.*  Because Plaintiff has failed to explain how Unicity has benefited from or exploited the agreement between Plaintiff and Unicity, the Court will not compel Unicity to arbitrate.

Accordingly, in granting Anytime Labor's Motion to Compel arbitration, the Court will stay the claims against Anytime Labor while allowing the claims against Unicity to proceed in this forum.  As such, the Court now turns to Unicity's Motion to Dismiss.

**B. Unicity's Motion to Dismiss**

Defendant Unicity moves to dismiss all of Plaintiff's claims against it.  The Court considers the sufficiency of Plaintiff's pleading for each claim, beginning with negligent supervision and retention.

**1.  Negligent Supervision & Retention**

Unicity moves to dismiss Plaintiff's negligent supervision and retention claim.  In Nevada, the elements of a claim for negligent training, supervision, or retention are: "(1) a general duty on the employer to use reasonable care in the training, supervision, and retention of employees to ensure that they are fit for their positions, (2) breach, (3) injury, and (4) causation." *Lambey v. Nev. ex rel. Dep't of Health and Hum. Servs.*, 2:07-cv-1268-RLH-PAL,

2008 WL 2704191, at *4 (D. Nev. July 3, 2008) (citing *Hall v. SSF, Inc.*, 930 P.2d 94, 98 (Nev. 1996), for duty and breach elements and *Jespersen v. Harrah's Operating Co.*, 280 F. Supp. 2d 1189, 1195 (D. Nev. 2002), for elements of injury and causation).

First, Unicity contends that Plaintiff's negligent supervision and retention claim fails because Plaintiff does not allege injuries caused by a negligently managed employee. (Mot. Dismiss 5:9–6:9, ECF No. 35). It bases this argument on the Nevada Supreme Court's holding in *Freeman Expositions, LLC v. Eight Judicial District Court*, that "a claim for negligent hiring, training, or supervision contemplates liability for an employer based on injuries caused by a negligently managed employee." 520 P.3d 803, 812 (Nev. 2022). The *Freeman Expositions* court concluded that the plaintiff had failed to state a claim for negligent hiring, training, or supervision because he alleged only that he was wrongfully terminated. *Id.* The court based its holding on the fact that the plaintiff's allegations related only to the conduct of the employer and not that of another employee. *Id.* The facts here are significantly different: Plaintiff has alleged harm caused by another employee, not of the employer. Thus, the holding in *Freeman Expositions* does not apply here.

Unicity next asserts that the negligent supervision claim premised on an employee's alleged discriminatory conduct should be dismissed because there is an exclusive statutory remedy for such a discrimination claim that displaces this common-law tort claim. (Mot. Dismiss 6:10-7:8). The Court is unpersuaded, however, because Defendant does not show that Nevada Supreme Court authority extends statutory preclusion to all negligence-based torts whenever discrimination is alleged. The Court notes that while tortious discharge actions have been preempted by statutory remedies, Nevada precedent does not uniformly bar all tort claims that overlap with statutory rights. *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 885 (Nev. 1999). Recent cases expressly distinguish negligent supervision from tortious discharge, finding that the existence of statutory remedies does not automatically preclude a common law

claim unless the legislature clearly intended such exclusivity or where the tort claim merely restates the statutory violation. *See Freeman Expositions*, 520 P.3d at 810.  Thus, the Court finds insufficient grounds to hold the negligent supervision and retention claim preempted at the pleading stage, especially where Plaintiff's allegations may involve facts beyond those directly addressed by the statutory remedies.  Accordingly, the Court DENIES Plaintiff's Motion to Dismiss this claim.

### 2. NRS 613 and Title VII

Unicity next moves to dismiss Plaintiff's claims for discrimination under NRS 613 and Title VII for failure to state a claim. (Mot. Dismiss 7:25–8:9:2).  To establish a *prima facie* case of discrimination under Title VII, a plaintiff must allege that he: (1) belonged to a protected class; (2) was qualified for the job; (3) experienced an adverse employment action; and (4) similarly situated employees outside his protected class were "treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010).

The parties do not dispute that Plaintiff adequately alleged he is a member of a protected class, nor that he suffered an adverse employment action. (*See* Mot. Dismiss 8:12–20); (Resp. 12:7–10, ECF No. 42).  The Court therefore considers only whether Plaintiff has plausibly alleged that he was qualified for the job and whether similarly situated employees outside his protected class were treated differently.

Plaintiff claims he has alleged sufficient facts for the purposes of a 12(b)(6) motion to make a plausible claim that other employees were treated more favorably because they were not called racial slurs, remained employed, and received preferential treatment. (Resp. 13:12–16).  While the FAC alleges that Plaintiff was called a racial slur and received worse treatment, the FAC does not contain allegations that other employees were not called racial slurs, as Plaintiff asserts. (*See generally* FAC).  The FAC does include, however, a statement that

"[o]ther similarly situated employees were treated more favorably than Plaintiff, including but not limited to the preferential treatment of Mario and Julio despite complaints of racial slurs in the workplace, and other employees placed through Anytime Labor were offered permanent positions with Defendant Unicity." (FAC ¶ 47).  The claim that other temporary workers were offered permanent positions, while Plaintiff was terminated, is sufficient to support the claim that other similarly situated workers were treated more favorably at this stage of litigation.  The Court thus concludes that Plaintiff has adequately alleged that other similarly situated employees were treated more preferably.

As for the element that Plaintiff was qualified for his job, Plaintiff contends that he has plausibly alleged that element, pointing the Court to paragraphs 9, 14, 38, and 45. (Resp. 12:16–21).  The Court identifies only one statement that pertains to his qualifications for the job, which states "Plaintiff was qualified for his position as a Warehouse Hand." (FAC ¶ 45). Such a statement is merely a "formulaic recitation of the elements of a cause of action." *See Twombly*, 550 U.S. at 555.  Without more, Plaintiff has not satisfied the pleading standard as to that element of his claim. *See id.*  Because Plaintiff failed to sufficiently plead facts to satisfy an essential element of the claim, the Court GRANTS Unicity's Motion to Dismiss Plaintiff's discrimination claims under Title VII and Nevada law.  It appears this deficiency can be remedied; thus, the Court grants Plaintiff leave to amend this claim.

### 3. Race-Based Discrimination under § 1981

Section 1981 "prohibits [racial] discrimination in the 'benefits, privileges, terms and conditions' of employment." *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008) (quoting 42 U.S.C. § 1981(b)).  To state a claim under § 1981, a plaintiff must allege (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerns one or more of the activities enumerated in the statute. *Keum v. Virgin Am., Inc.*, 781 F. Supp. 2d 944, 954 (N.D. Cal. 2001).  An

allegation of discrimination based on disparate treatment or disparate impact is insufficient to bring a claim under § 1981. *See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391, (1982) ("[Section] 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination.").

Unicity argues that Plaintiff has failed to allege facts to support an inference that he was subjected to intentional discrimination on the basis of race. Relying on several of this Court's cases to support this argument, Unicity contends that Plaintiff's § 1981 claim must be dismissed. But, as Plaintiff notes, the cases Unicity relies on are materially distinct from the allegations made here. Unlike *Jackson v. Universal Health Services*, where the plaintiff alleged that she was referred to as RuPaul, Plaintiff here alleges that he was called "nigger," an explicitly racial slur, on multiple occasions. No. 2:13-CV-01666-GMN, 2014 WL 4635873, at *3 (D. Nev. Sept. 15, 2014); *see also NRLB v. Foundry Div. of Alcon. Indus., Inc.*, 260 F.3d 631, 635 n. 5 (6th Cir. 2001) ("That the word 'nigger' is a slur is not debatable."); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) ("It is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination.").

Further, while the acts identified by plaintiff in *Jackson v. Universal Health Services* did not appear to have any relation to her race, the same cannot be said here. Plaintiff alleges that he was "repeatedly subjected to racial discrimination on a daily basis, including being called racial slurs such as 'nigger' by his coworkers," including his supervisors. (FAC ¶ 12). Despite reporting this behavior, he alleges that the conduct continued to escalate without consequence. (*Id.* ¶ 14). Lastly, he alleges that he was terminated from his job, as least partially because he reported his coworker's use of racial slurs. (*Id.* ¶¶ 96-08). These allegations are sufficient to support Plaintiff's claim for racial discrimination under § 1981 at the Motion to Dismiss stage. The Court therefore DENIES Unicity's Motion to Dismiss this claim.

### 4. Harassment

Unicity next moves to dismiss Plaintiff's harassment claim, asserting that the facts alleged are not sufficiently specific to support the claim. (Mot. Dismiss 11:17-12:20).  To state a prima facie case of hostile work environment based on race, a plaintiff must show (1) he was subjected to verbal or physical conduct because of race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1055 (9th Cir. 2007); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003). "The working environment must both subjectively and objectively be perceived as abusive." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (internal quotation marks and citation omitted).  "To determine whether conduct was sufficiently severe or pervasive to violate Title VII, we look at 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001)).

To begin, Unicity's assertion that the FAC's lack of "specific details concerning the frequency of the harassment or when it occurred" misunderstands the motion to dismiss standard.  Plaintiff alleges that he was "repeatedly subjected to racial discrimination on a nearly daily basis" by multiple employees and supervisors. (FAC ¶ 12).  Thus, Plaintiff specifically alleged the frequency of the harassment, and he is not required to state exactly when each instance of harassment occurred to satisfactorily state a claim.

Further, Unicity's contention that the complained of activity was not sufficiently severe is also not correct.  Far from alleging "simple teasing," Plaintiff was repeatedly called a racial slur.  Unlike the cases Unicity cites to support its argument, Plaintiff has not alleged "an

isolated incident of a racially charged comment," nor a "single racist comment"—he has alleged that he was "repeatedly subjected" to racist remarks on a nearly daily basis. (FAC ¶ 12). His allegations that he reported this behavior, that it was not addressed by the employer, and that it continued and escalated over time, further bolster an inference that the conduct was severe and pervasive. (*Id.* ¶¶ 13, 15, 16). Thus, the Court finds that Plaintiff's allegations plausibly state a claim for harassment, and therefore DENIES the Motion to Dismiss this claim.

### 5. Retaliation

Title VII makes it unlawful for an employer to discriminate against any of its employees or applicants for employment because the employee has "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e3(a). Similarly, Nevada law makes it unlawful for opposing "any practice made an unlawful employment practice by NRS 613.133 or 613.310 to 613.4383." NRS 613.340. To state a prima facie case of retaliation under Title VII, § 1981, and Nevada law, a plaintiff must allege that: (1) he engaged in a protected activity, (2) the employer subjected him to an adverse employment action, and (3) "a causal link exists between the protected activity and the adverse action." *Manatt*, 339 F.3d at 800 (9th Cir. 2003).

"Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360. Causation "may be inferred from proximity in time between the protected action and the allegedly retaliatory employment decision." *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir. 2000) (quotation omitted). The plaintiff "must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity."

*Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003), *opinion amended on denial of reh'g*, No. 00-35999, 2003 WL 21027351 (9th Cir. May 8, 2003).

Unicity first argues that all of Plaintiff's retaliation claims do not allege the requisite causal link, taking issue with the lack of specific allegations to support a finding of "but-for" causation. (Mot. Dismiss 13:2–23).  But Unicity's argument asks the Court to impermissibly raise the requirements of the liberal pleading standard.  Plaintiff need not allege every detail about a retaliatory act, so long as he alleges enough facts to state a plausible claim for relief. He alleges that he engaged in protected activity by reporting racial harassment to his supervisor and he was moved to more menial tasks and terminated as a result.

A plaintiff may establish a causal link between her protected act and the alleged retaliatory action through showing temporal proximity or by other evidence that shows that the employer would not have taken the retaliatory action but-for the plaintiff's protected act. *Ray*, 217 F.3d at 1244.  The cases that accept temporal proximity uniformly hold that the timing must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quotation omitted).  There is no temporal proximity, for example, when the gap between the protected activity and alleged retaliation is three months or longer. *Id.*  Here, the temporal proximity of Plaintiff's alleged protected activity and the retaliatory acts are significantly less than three months (the total time of his employment at Unicity), and therefore support the plausibility of his claims.  At this stage, Plaintiff has plausibly alleged that the purported retaliatory acts might not have happened if not for his protected actions.  Consequently, the Court DENIES the Motion to Dismiss Plaintiff's retaliations claims under Title VII, § 1981, and Nevada law.

### 6.  IIED

To state a claim for IIED under Nevada law, Plaintiff must allege that (1) Defendant's conduct was "extreme and outrageous," (2) Defendant intended to cause Plaintiff emotional distress or demonstrated reckless disregard for the probability of causing emotional distress, (3)

Plaintiff actually suffered "severe or extreme" emotional distress, and (4) Defendant's conduct proximately caused the distress. *Nelson v. City of Las Vegas*, 665 P.2d 1141, 1145 (Nev. 1983).

Unicity argues that Plaintiff has not sufficiently alleged conduct that is extreme and outrageous and has not alleged sufficiently severe emotional distress to support an IIED claim. (Mot. Dismiss 15:11–7:11).  With regard to the first argument, extreme and outrageous conduct is conduct that is "outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maudike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998).  The Nevada Supreme Court recognizes IIED claims in the employment termination context. *Shoen*, 896 P.2d at 476.  While personnel management activities such as firing, without more, are "insufficient to support a claim of [IIED]," *Welder v. Univ. of S. Nevada*, 833 F. Supp. 2d 1240, 1245 (D. Nev. 2011), Plaintiff also alleges that he was repeatedly called a slur on an almost daily basis, and that his employer did not intervene despite Plaintiff's reporting of that behavior.  The Court finds that such allegations, especially repeatedly being called "nigger" while at work, are sufficient at this stage to support an inference that Plaintiff was subject to conduct that is outside the bounds of decency and is intolerable in civilian life. *See Gardner v. LKM Healthcare, LLC,* No. 3:10-CV-0686-LRH-VPC, 2012 WL 3100562, at *3 (D. Nev. July 30, 2012) (finding that plaintiff's testimony that she was called derogatory racial slurs, including "nigger," by a supervisor at work precluded summary judgment because such conduct is extreme and outrageous).

As for Unicity's contention that Plaintiff has not alleged sufficiently severe emotional distress, the Court agrees.  Plaintiff alleges that he suffered "financial hardship and grievous menstrual and emotional suffering in the form of worry, fear, anguish, shock, nervousness, stress, and anxiety." (Compl. ¶ 115).  These allegations are too conclusory; they lack sufficient factual content to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 679.  Without more factual content, the

Court cannot find that these allegations plausibly allege that Plaintiff suffered severe emotional distress. Accordingly, the Court GRANTS Unicity's Motion to Dismiss Plaintiff's IIED claim. Because this deficiency can be remedied by more specific factual allegations, the Court grants Plaintiff leave to amend this claim.

## IV.    CONCLUSION

**IT IS HEREBY ORDERED** that Anytime Labor's Motion to Compel Arbitration, (ECF No. 28), is **GRANTED**. The claims against Anytime Labor are STAYED pending arbitration.

**IT IS FURTHER ORDERED** that Anytime Labor's Motion to Stay Case, (ECF No. 30), is **DENIED as moot.**

**IT IS FURTHER ORDERED** that that Unicity's Motion to Dismiss, (ECF No. 35), is **GRANTED, in part, and DENIED, in part.** If Plaintiff seeks to amend the claims dismissed without prejudice in this Order, Plaintiff shall have 21 days from the date of this Order to do so.

**DATED** this __23__ day of March, 2026.

_____
Gloria M. Navarro, District Judge
United States District Court